Good morning, may it please the court, Amy Christensen, on behalf of Mr. Barton, this case. The district court abused its discretion in this case when it admitted the DNA evidence without requiring a scientific foundation for the lab's method of interpreting complex mixtures. The reliability prong of Daubert tells us that a district court should consider whether the expert's methodology has been tested, whether there's a knowable rate of error, whether it's been subjected to peer review, and whether the method has gained general acceptance. Can I ask you a quick question before we get into the weeds on Daubert and, you know, sort of multi-source samples? Is the error here harmless if there is one? I mean, there are five, it seems to me, pretty devastating pieces of non-DNA evidence. Your client at the scene twice, his wife at the scene once, his wife again at the trial, and his cellmate at the trial. Everybody says the gun was his, he threw it. So why, I mean, there are pages and pages and pages of analysis, really interesting science, but I wonder at the end of the day if any of it matters. And we can't know the exact weight that the jury placed on the DNA evidence, but we do know that in this country there is a CSI effect. Well, so I worry a little bit about that, too, is that it seems to me that you never, you really haven't engaged in your briefing before us the harmless error argument. Certainly not in the blue brief. There's one sentence, I think, at the end of the blue brief that says something. And then even in the gray brief, the government spent pages and pages talking about harmless error, and in response you basically say, and I don't mean to be trite, but, you know, there are cop dramas and people are, there is the CSI effect and people are sort of compelled by DNA evidence. But that doesn't really address the guts of the government's argument. And I agree that, I agree. And it was an 80-page brief and there was limited amount to harmless error. But I think if they were having any doubts at all about this jailhouse snitch who has some motive to give this information, he gets a reduced sentence. We have a credibility issue with the wife. She said one thing to the police one time and then flipped her story. And then we have a reluctant confession. So if there was any doubt in the jury's mind, I think the DNA evidence was the icing on the cake. And what made it so harmful, I think, is that the government kept pounding the fact that it was routine. This is routine DNA analysis. They do it thousands of times a year. They do it every single day. There was nothing out of the ordinary that took this sample to a different level. We interpret it the same way we do every other piece of DNA. So with that CSI effect, the jury's thinking, well, you know, in the TV shows, the commercial break, you come back, they know who the killer is, the DNA points right to them. In this case, it's a lot different because they provided no scientific foundation that this complex mixture could be interpreted in a routine way. Yet they pounded it and pounded it at trial that there was nothing out of the ordinary. Do you think it's realistically probable that if the DNA evidence in this case had never come in, but the evidence had come in that the guy twice confessed at the scene that the wife confirmed that he did it, she gets up on the stand again and says that he did it, that the jury wouldn't have convicted? I think there were a lot of credibility issues with the witnesses that could have been fully explored. Of course, we have findings by the magistrate judge who conducted the hearing. As I understand the nature of the argument, the first was the validation study performed by Trinity on the fusion kit was inadequate because the study didn't include testing involving mixtures of samples from three or more donors. The magistrate concluded that regarding the validation studies, the argument lacked merit because these studies were, quote, done under well-accepted standards and the magistrate judge specifically credited Zaliga's testimony that the same principles outlined in the validated studies for mixtures applied whether the mixture contained DNA from two, three, or more donors. That's what we have from the magistrate judge who conducted this hearing. Where's the clear arrow of judgment in that? That data can be extrapolated from two persons. In other words, you may have dueling experts who say quite the opposite thing about that, but that doesn't mean that that renders one side's expert inadmissible. It does when it's only the expert's word for it. The court took the expert's word for it that she could extrapolate data from two-person samples. There was no scientific journals. There were no references to guidelines. There was nothing within the scientific community that that court could look at and say, yes, she's telling me she can extrapolate data and here's the scientific authority that also supports her being able to do it. This is a case where a genuine scientist comes in and offers an unscientific opinion and the judge simply took her word for it. He relied on her own manual that she submitted that she wrote in her lab with no reference to any guidelines or anything that would make it authoritative. That very manual was approved in accreditation and it was approved every two years in their regular audits. It seems to me that the fact that that manual, and furthermore, that manual was consistent with the SWGDAM, is that how you pronounce that? SWGDAM, yes. Which was, as I understand it, the prevailing accepted guideline, which said that SWGDAM that was current at that time said only that you could, this is real rough paraphrase, but that you could identify the major if there was a predominance of the major, which in these means the peak was highest. So it seems to me there was significant scientific backing for her opinion. That's assuming a single source or a double source sample. That's not assuming a complex mixture where you have No, I'm talking about a complex mixture. The SWGDAM guidelines that are in their manual do not adequately cover complex mixtures. I'll read it to you if I can find it. It says, and I paraphrased it, about predominance. That's what it said. Now, 2017 after the fact is very different and very favorable to you, but we can't use that. I think you can, Your Honor, because part of science, we're not talking about the retroactive application of a statute. We're talking about science, and we look at what is presently known, and the whole concept of peer review The circuit bonds case says we don't do that. Does it not? I don't think so, Your Honor. I think the Alfonso Williams case, they looked at the 2017 guidelines. And that's a district court That's a district court case where it's not In my recollection, it's distinguishable anyway. I can't quite remember why now, but actually that was at the time of the hearing, I think the 2017 SWGDAM was extant at that time, at the time of the hearing in Alfonso Williams. Am I not correct? Right, but it was still after the testing at issue. Oh, sure. After the testing, but not after the hearing. And here, it was after the hearing. It was after the hearing. It was. Let me ask the question more basically. How could a trial judge performing the gatekeeping function under Daubert abuse her discretion in failing to credit information never presented to the court in the first place? Because it didn't exist at the time. It did exist at the time. The concept of validation has always existed. If you're going to make a call in a case, you have to back it up with sound scientific explanation. You can't just go in and say, trust me, I'm a scientist, I can do it this way. But your argument, to get to Judge Marcus' point, your argument is that the SWGDAM, whatever they're called, guidelines demonstrate clearly the validation error that you're talking about. The point that Judges Marcus and Anderson have raised is that that clarity didn't arise not only after the testing, but after the hearing. The district court had no basis for concluding that there was a clear error here because the guidelines to which you're pointing didn't exist at the time. The guidelines didn't exist, but the concept of validation did. A lab knows that if it's going to perform certain testing and case work, it needs to back it up with sound scientific explanation, such as testing similar samples to see how they behave in your particular lab so you know whether your analysts are making allele calls 100% of the time, 50% of the time, whatever your rate of error. That's not a new concept. Yes, the 2017 guidelines expounded on mixture interpretation. That's only because that became more of a practice. They weren't really doing this kind of mixture interpretation back in 2010. And that's what Butler and all the other authoritative sources say. So while the 2017 guidelines aren't intended to apply retroactively, there is a little section in there that says, as long as the prior testing was based on validation or good grounds. And we don't have that in this case. The problem that you have is the standard is very high. The district court's got a whole bunch of discretion. And we say, and I quote, we said this in Bonk, in the Frazier, the deference that is the hallmark of abusive discretion requires that this court not reverse an evidentiary decision of a district court unless the ruling is manifestly erroneous. We're talking very specifically about expert testimony going to the question of foundation or reliability. Manifestly erroneous. It just struck me, reading the materials here, and perhaps I've got it wrong, but it struck me that you really had two ruling experts who looked at the same operative area in a somewhat different way, but there was enough to allow both in and it was a jury question to decide whether you credited one or the other. Where am I wrong in that? I don't think it's a question of two experts disagreeing. In other words, one says a threshold here, another says a threshold here. We're talking about a fundamental difference in how these mixtures are interpreted. If you look at the Morgan case, the Second Circuit case, while it actually admitted the evidence, it does provide a benchmark as to what the indicia of reliability would be. We're talking about a lab that is the leading lab in the country for performing this kind of testing. It has 160 lab analysts with extensive training and experience. It had 800 validation studies that it did on low-level mixtures. They had 100 percent accuracy rate in making those allele calls. They had peer review. All of their protocols, all of their procedures were submitted for peer review and approved. They're like the gold standard. Then we look at Trinity, a lab that has one analyst with no testing from before to show you, yes, I've done this type of testing before. I've done three-person samples. I could make allele calls, 190, whatever the rate of error was, she would be able to have that. We have no mathematical computations. She simply looks at heights on a graph and says, well, those two are higher. They must belong to the major contributor. But what about these effects that are occurring? What about these known effects that are occurring in science that make random... You keep saying she, I call her Z, Zulinger, had no science, but it was accredited, as I said. It was audited every two years, and it was consistent with the 2010 SWGSAM. In other words, her validation on the two-person mixtures was good logic to go with the three-person mixtures. I think this, in addition, bolsters her opinion. She also testified that she could tell from looking at the entire profile that there were at least two other, at least three, donors. And she could tell that all of them except one were very, very minor. And you can look at the profile yourself, as I did, and you can see every time there are five little peaks, there's one that's way high, and the others are way, way low, which bolsters the fact that these other donors are very, very minor donors. In other words, there's not much of that DNA there. And therefore, the sharing of the peak is the only problem you raise as a potential problem with having three or more people. In other words, that high peak might be some of those minors. Now, if sharing is a very, very minor thing, which she testified with support in the record, I suggest, does that not mean that, may not be true for other cases, but in this case where there's little or no sharing, the logic of the two-person validation studies does apply, because there is little or no sharing. There is sharing, and the peaks that you see could be, remember, we have no bounds to the number of contributors this could possibly be. It could be three, four, five, six. So those high peaks could be the result of six people's DNA. That's certainly not a major contributor. How many ever there are, and we probably are only three, because the only location, loci, where there are multiple peaks, there are five, which means that there are at least three people, because you've got to have two for each person. So if there are others, there's so little they don't ever even show up. We don't know that, Your Honor. And the other problem— We don't know how many contributors there are. We don't know whether dropout has occurred. That's also the problem. Don't they drop out when they are so small? Not dropping out because they're so small. They're dropping out because the quantity of DNA that's being tested is so low. There's a threshold below which you have to assume that data is there but missing. And there have been well-accepted steps that they took to take care of low count. Is that not true? They took no steps except to say that she looked at the peak heights and figured out which ones were higher than all the others. She increased, because of the low count, she increased the RFUs from 200 to 400. And there's even a problem with that. Is that not true? She did increase the RFUs, which means that multiple contributors are raising the peak above the stochastic threshold. So if there's five contributors contributing to that peak, any one of them could be falling below the threshold. You know at that point you're in the danger zone. That data that should be there is not there. That data that is dropping out of the sample, that people are supposed to be in that sample that aren't in that sample. That should have been a red flag to her to not just go ahead and test this just like she would any other sample. I see my time is up. Thank you very much. May it please the Court, Reporter Bodnar for the United States. I'd like to start with Judge Newsom's first comment and touch briefly, Judge Marcus, on something that you said towards the end of counsel's argument. This is much ado about nothing because it was harmless. And this is a very interesting and compelling subject matter. And so it's easy to get into the weeds on the DNA analysis. And I'm prepared to go there. But I want to start by saying, yeah, there were five devastating pieces of evidence. He admitted ownership or possession of the firearm two times. Moore, his ex-girlfriend, not his wife, was the one who was there at the scene. She separately said, he threw it at my feet. I kicked it under the chair. When he talked to the deputy there at the scene, he admitted that he'd thrown it to the side of the car, which shows he knew where she had found it. Moore came back later at trial, testified absolutely consistently with what she told the deputies at the time. And Sims had details that he could not have known had he not learned them from Barton. So lots and lots and lots of evidence of possession here. On top of that, we had both experts testifying. And every complaint that Barton has made about this evidence was brought out on the harmless error. He not only told the officer at the scene that he threw it over to the passenger side, but he also said that he bought it off the street in some town that starts with a Z. Zephyr Hills, yes, Your Honor. And I thought that was significant, that he had detail. Right, he had that detail. As well as his confession to Sims was in detail about how he bought the gun from somebody named Rhonda, or somebody, I can't remember who. He did give her name. He had that detail, and he also said that she'd scratched the serial number off, and this was a obliterated serial number firearm. I thought about the harmless error, and I do think that DNA is so powerful that I imagine the jury did consider it and consider it as significant. And I understand that, Your Honor, and that's why I circled back to something that Judge Marcus had said about the two experts. Yes, DNA evidence is powerful, and the jury is going to be trained by television to consider it, but here they had both sides of the story. So how powerful is the jury going to view this DNA evidence if they have two experts? And it was, the government even conceded it was contested. Yes. The DNA was contested. The test on DNA, suppose we think that the DNA evidence was significant to the jury, but that the evidence was so clear that the jury surely would have convicted in the absence of the DNA. Is that the test? In other words, if we are confident that the jury would have convicted anyway, then is it harmless, or is it not harmless because the evidence was significant? Okay, we're reviewing for abuse of discretion, and we don't reverse an abuse of discretion unless it was actually harmful. I'm talking about harmless error right now. Right, because we don't reverse unless it's harmful. The test is harmless error. Now, this is DNA evidence, and ordinarily I would say, yeah, DNA evidence, ooh, it's exciting, it's scientific, and the jury's going to pay attention, but you had two competing experts here. So what I'm saying about the harmlessness is this DNA evidence is not like uncontested DNA evidence with big statistics that sound very impressive because this was a case in which the jury heard both sides of the story. They had cross-examination. They had a competing expert. So I don't think this DNA evidence had quite the impact that DNA evidence might have in another case. So to Judge Anderson's question about the standard, when you say quite the impact, is it quite the impact sort of vis-a-vis the result or vis-a-vis sort of the balance of information given to the jury? The latter, Your Honor, the balance of information given to the jury. I don't think, I understand the instinct to say DNA evidence is a big deal, and in some cases it surely would be, but it's less of a deal in this case. It's less impact because of the competition. I think that is an even more favorable answer. I think the answer to my question is that the DNA evidence, in order not to be harmless, it has to be, in order to find it harmless, all we have to conclude is that it did not affect the result, the outcome. Oh, that's true. Even if it influenced the jury, if we are sure that the jury would have come to the same outcome, then it is harmless. I think that's the test. That is the test, Your Honor. I'm just saying that if we were to assume that it had some impact, it's having less impact in this case than it might in others. I will turn to the admissibility of the evidence, too, because that's an issue in this case. Of course, when we talk about harmless error, on an evidential point, we're not talking about the government having the burden to prove homelessness beyond a reasonable doubt, are we? No, this isn't the Constitution. Right, so the burden is for harmless error more likely than not? Yes. Okay, so that's the standard. Yes. To the extent we're groping for a standard here. That's right. If I could turn to the abuse of discretion itself, that question, there is no abuse of discretion here. We all agree that the expert was qualified, and we agree that the information was helpful to the jury, so the relevance prong is satisfied. Her qualifications are satisfied. What the defendant contests is the reliability of the evidence itself. But this evidence was subject to a kind of peer review because the manual was audited and approved by the ANAB, which was the accrediting agency. That manual was based on scientific accepted standards because it was consistent with the FBI's quality assurance standards. It was consistent with the International Organization for Standardizations, the ISO standard. It was consistent with the then-controlling SWGDM guidance. And it was tested. The PowerPlex Fusion Kit had been tested in the manufacturer's validation studies. Trinity had performed its own validation studies. It knew the stochastic threshold. That would be the error rate. And she applied those stochastic thresholds and the analytical threshold to come up with a conservative statistic, which accounted for the stochastic effects. All of that information supported the validity of this study. Now, with respect to the 2017 SWGDM guidelines, the Bond case absolutely explains why you can't bring in evidence after the hearing in an appellate context and somehow apply that to show that the district court abused its discretion. No, a district court doesn't abuse its discretion by failing to consider guidance that did not yet exist at the time of the hearing. More importantly, this is... Does that mean we can never look post hoc at new information that profoundly alters the scientific landscape? That can't be right. You can see why that would create an enormous problem. There may be a change that's so profound that it necessarily has to affect it, even if the trial judge was wholly unaware of it, because the breakthrough did not come until later. But, Your Honor, that might be applicable in the context of a motion for a new trial. It doesn't show an abuse of discretion at the time the evidentiary call is made. Ordinarily, we look at new evidence of guilt or innocence under a motion for a new trial or under some kind of post-conviction filing. There's a standard for that. I'm not sure that this evidence actually even fulfills that standard, because here we're talking about facts that bear on, don't control, but bear on, the admissibility of other evidence. We're not talking about new evidence of guilt or innocence here. But what we can't do is use these 2017 guidance memoranda as a way of saying that this district court abused its discretion. One, because that turns this court into the fact-finder and bypasses the actual fact-finder. Two, because it deprives the court of the opportunity to hear explanatory and rebuttal evidence. It deprives the United States of the opportunity to present the rebuttal evidence, and that's not this court's function. This evidence is by no means clear, and I'd like to point out something that the 2017 guidelines say right up front. These guidelines generally address the interpretation of single-source samples and mixtures of DNA from two people. The basic concepts hold true as they relate to DNA mixtures of three or more contributors. That's exactly what Zuliger testified to. And that was the make-it-or-break-it for the magistrate judge and the district court in determining that this was reliable. Did you read that from the 2010? From the 2017, the second page of the 2017 guidelines. The 2017 guidelines, just like the 2010, they are not retroactively applicable. Why? Because these guidance memorandas say that these are best practices. These are not minimum thresholds. The FBI's QAS standards are what apply for the minimum thresholds in the event of a conflict. The SWGDM 2017 and the SWGDM 2010 both say that. Yet we don't have any evidence in this record of what the FBI's QAS is saying now, that there's a 2017 change. That's something that would have had to have been developed, and perhaps it was developed in Williams. But my point is that this new requirement in 2017 that did not exist in 2010 to have validation studies done on multiple minor contributors. That's new. It can't be retroactively applied under the very terms of the 2017 guidance. It's not meant to be retroactively applied. The validation studies that were done by Trinity under the 2010 guidance were proper validation studies for that 2010 guidance because the requirement of multiple contributor studies didn't exist until 2017. Sure, there were people out there who thought it ought to be done, including Johnson, the defendant's expert, and she testified to that, and the jury heard the competing views. This is not a case where the jury was presented with only one form of this expert testimony. This is a case like Kumo where the Supreme Court said when experts disagree, then it's for the jury. That's exactly right. Cross-examination and the presentation of contrary testimony are the ways that you deal with that, and that's exactly what the district court did in this case. There is no abuse of discretion here, and to the extent that the 2017 guidance memo has changed at all, that's something for a court to consider in the context of a different kind of motion, and it probably does not even meet the standard for consideration for the presentation of a motion for a new trial because this is information bearing on the admissibility of other evidence. It's not evidence of guilt or innocence. Was it ever presented post hoc to the district court? No, Your Honor. No new trial motion pegged to the 2017 guidelines? No new trial motion at all, and certainly not anything pegged to the 2017 guidelines. This is a review for abuse of discretion, and there has been none. Unless the court has other questions, I'll ask the court to affirm. Thanks very much. And you have, Ms. Christensen, reserved two minutes. Thank you. In the closing statements to the jury, the government told the jury that the jailhouse snitch wasn't the bombshell witness and that if it was Mr. Barton's gun, then his DNA would be on the gun, and his DNA was on the gun, and the most conservative chance that it was anybody else other than Mr. Barton was one in 41 million. That is a huge statistic in the eyes of a jury, and it was based on nothing but the expert's own word for it that she could correctly interpret complex mixtures at that point, which was the cutting edge of DNA technology. But this lab in Florida, with 2010 guidelines that don't appropriately address these kind of mixtures, she's looking at a sample. It's low level. It's lower than her optimal level even for a single source sample. It's a mixture, not of two people, three people, four people, five people. And then when she ran it, data was falling below her already established threshold at every single location in the sample. If that's not something that would have given her pause, I don't know what would. At that point, that was the point where that expert should have proceeded with extreme caution in interpreting the sample. And all we asked for is for her to provide a scientific basis for making those calls. We're not saying that this evidence can never be interpreted. We're just saying it has to be done reliably. If she had any of the indicia of reliability that the Morgan lab had, we wouldn't be here today. If she had shown us through validation studies that she had done this before, could correctly make these calls, that she was relying on guidelines that we now know are generally accepted, we wouldn't be here. We were asking for a foundation, and we never got it. Thank you. I notice, counsel, that you are court-appointed. We very much appreciate you taking on the burden of vigorously representing your client.